OPINION OF THE COURT
Phyllis Gangel-Jacob, J.
This motion involves serious constitutional issues which *686 have been raised liminally by the Mental Hygiene Legal Service (MHLS) acting as counsel for Martin B. This motion is technically part of what are now the postjudgment civil proceedings in what was originally a criminal prosecution. (People v Escobar, 61 NY2d 431 [1984].)
The Bronx District Attorney is entitled to participate in these proceedings and has done so by submitting an affirmation in opposition to the memorandum of law submitted by MHLS, described below. The New York State Attorney-General has also filed a responsive memorandum of law in support of its motion. It is on the original notice of motion and supporting papers, these memoranda of law and MHLS’s memorandum of law, that this motion is being decided.
Martin B. was indicted in The Bronx in 1980 for the murder of his mother, the attempted murder of his wife and possession of a weapon. In June 1981, Mr. B.’s plea of not responsible by reason of mental disease or defect was accepted by the court. Subsequently, at a hearing pursuant to CPL 330.20 (6),* the court (David Levy, J.) found Mr. B. then neither had a dangerous mental disorder nor was mentally ill. On December 15, 1981, an order of conditions, subject to which Mr. B. was discharged, was entered pursuant to subdivision (7) of the section.
Those conditions, as directed by the key provisions of subdivision (1) (o), required Mr. B. to comply with a treatment plan aimed at dealing with his alcoholism problem. The plan initially involved screening and in-patient treatment and ordered Mr. B. to comply with such treatment plan and "remain under the supervision of Commissioner of Mental Health” for the next five years. When those five years had passed, the Attorney-General, acting for the Commissioner of the New York State Office of Mental Health (the Commissioner) moved this court for "an Order pursuant to CPL 330.20 resettling and extending this Order of Conditions” for the ensuing five years. It is that motion that is before the court now. It is in opposition to that motion that MHLS has submitted a memorandum of law raising due process and equal protection questions with respect to the facial application of the provision for *687 a further extension of the order of conditions in subdivision (1) (o).
Subdivision (1) is a definitional provision. Nevertheless, it contains the language on which the court must rely for guidance in this case and on which MHLS has focused its argument. Subdivision (1) (o) reads as follows: " 'Order of conditions’ means an order directing a defendant to comply with this prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate, and, in addition, where a defendant is in custody of the commissioner, not to leave the facility without authorization. The order shall be valid for five years from the date of its issuance, except that, for good cause shown, the court may extend the period for an additional five years.” (Emphasis added.)
Thus, although Mr. B. is at present a patient at Manhattan Psychiatric Center and has been hospitalized either there, at the Payne-Whitney Clinic or at the Bronx Alcoholism Treatment Center for all but 9 months of the last 5 years, it is not his commitment which is at issue here, but his continuing subjection to the Commissioner’s "supervision”, as the statute has it. Mr. B. has, in fact, been a voluntary patient for at least the greater part of this period and is a voluntary patient now. His history and present condition, of course, are relevant to the substantive question of whether there is "good cause” for extending the December 15, 1981 order of conditions.
In addition to requiring compliance with the conditions stated in the order of conditions, the existence of such an order is at least the predicate for the continuing right of either the Commissioner or the originally prosecuting District Attorney to seek recommitment in a proceeding in which the standard is lower than in civil commitment proceedings, that is, the applicant’s burden is to be formulated as "the preponderance of the evidence” rather than as "clear and convincing evidence”. (See, People v Escobar, supra, at 440-441; and see, discussion of the case below.)
The court believes it must consider MHLS’s constitutional objections because, should they be correct, the court need not —indeed, cannot — order a hearing on the motion, but must dismiss it.
The court is mindful, in dealing with these objections, both of the presumption of constitutionality that accompanies section 330.20 as it does all duly enacted statutes (United States v *688 National Dairy Prods. Corp., 372 US 29, 32 [1963]; People v Illardo, 48 NY2d 408, 413 [1979]), and of the burden on the defendant in showing unconstitutionality (State of New York v Rutkowski, 44 NY2d 989, 991 [1978]).
Section 330.20 was a major part of the Insanity Defense Reform Act of 1980. (L 1980, ch 548.) That act, in turn, was recommended by the New York Law Revision Commission in a report prepared in response to a specific request of Governor Carey. (1981 McKinney’s Session Laws of NY, at 2251-2293; see also, Governor’s mem, 1980 McKinney’s Session Laws of NY, at 1879-1880, and 1980 Report of NY Law Rev Commn, 1980 McKinney’s Session Laws of NY, at 1599.)
The Law Revision Commission study was under the direction of Justice Peter J. McQuillan (then of the Supreme Court, First Judicial District, and now Administrative Judge, Supreme Court, New York County, Criminal Branch) and Court of Claims Judge Michael R. Juviler (then a Judge of the Criminal Court of the City of New York). The Study Advisory Committee was representative of the diverse geography of the State and of the even more diverse points of view that needed to be consulted on the insanity defense problem, which was and is "a subject of serious concern among judges, lawyers and experts in the field of psychiatry, as well as the general public”. (1980 Report of NY Law Rev Commn, op. cit., at 1599.) The Committee was chaired by Professor Herbert Wechsler of the Columbia School of Law and included Professor Abraham Abramovsky of the Fordham University School of Law, Dr. Abraham Halpern, M.D., Dr. Daniel Schwartz, M.D., the late Justice Irving Lang (then a Judge of the Criminal Court), Judge John Van Voorhis, retired from the Court of Appeals, and William C. Donnino, Esq., Bruce Ennis, Esq., and John F. Keenan, Esq. (now a Judge of the Federal District Court for the Sourthern District of New York).
Although the mandate of the Commission was broad and the creation of section 330.20 as it now stands (§ 330.20 was substantially amended, in ways not relevant to this proceeding, in 1981 and 1982) represented only 2 of its 6 major recommendations, section 330.20 is properly described as the "centerpiece” of the act. (See, Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 330.20, at 23.) The section was designed to provide for the "determination of the need for involuntary hospitalization of defendants who are found not responsible by reason of mental disease or defect [in such a way as] to ensure public safety and *689 to safeguard the rights of the mentally disabled offender [and comprehensive legislation * * * for dealing with such matters as * * * supervision upon release.” (1981 Report of NY Law Rev Commn, 1981 McKinney’s Session Laws of NY, at 2251; emphasis added.)
Basically, the section provides for continuing judicial control of (and the opportunity for continuing prosecutorial participation in) postjudgment decisions affecting the treatment and release or discharge of defendants found not responsible for criminal acts by reason of mental disease or mental defect. Its enactment was in part rooted in the turmoil attending judicial redefinition of the due process and equal protection rights of criminal defendants who successfully raised the "insanity defense”, a very small class if the statistics cited in the 1981 Law Revision Commission Report still prevail.
This is a case that involves balancing, not absolutes. Speaking in a general way, two Federal cases, Addington v Texas (441 US 418 [1979]) and Jones v United States (463 US 354 [1983]), and three New York State Court of Appeals cases, Matter of Torsney (State Commr. of Mental Hygiene — Gold) (47 NY2d 667 [1979]), People v Escobar (supra), and People ex rel. Thorpe v Von Holden (63 NY2d 546 [1984]), are helpful in defining the context in which the section is to be read and the terms in which the serious constitutional arguments under consideration are to be judged.
The liberty interest of a person found not responsible for a crime by reason of mental disease or defect is to be respected, and adequate procedural and substantive rights to guard that liberty interest are to be accorded. The section provides in subdivision (17) that "[s]ubject to the limitations and provisions of this section, a defendant committed to the custody of the commissioner pursuant to this section shall have the rights granted to patients under the mental hygiene law.” This includes, in appropriate circumstances, the right to proceed by way of habeas corpus. (People ex rel. Thorpe v Von Holden, supra.)
On the other hand, acts by the defendant which — but for the nonresponsibility of the defendant — would be defined as criminal provide an adequate basis for recognition of a heightened interest as to the public safety. This justifies some differences in treating such a defendant from procedures followed in ordinary civil commitment proceedings. The section, and indeed the entire act of which it was a part, repre *690 sents an attempt to balance these competing aims. As then Professor (now Judge) Bellacosa has said, it was designed to blunt "[ejfforts and discussion * * * with respect to elimination entirely of this 'defense’ or conversion of it to an affirmative defense with the burden of preponderant proof on the defendant.” (Bellacosa, Practice Commentary, op. cit., at 23.) These efforts and discussion continued after enactment. (Ibid.) Some concern for whether the section achieved its purpose or instead was in part "designed to soothe the public’s revenge instinct” is expressed in this Practice Commentary. (Op. cit., at 24.)
THE EQUAL PROTECTION ATTACK
The question here presented by MHLS is whether the section, in providing for renewal of conditions for release for a second five-year period, constitutes as such an impermissible discrimination against the class of those found not responsible for criminal conduct by reasons of mental disease or defect, a discrimination at a time and in circumstances where the "justification * * * draws impermissibly thin.” (Matter of Torsney, supra, at 674-675 [plurality opn].) This court concludes that there is no failure of equal protection in the mere extension and resettling of an order of conditions for five more years.
The court recognizes that this means the further imposition of conditions on a discharged person when that imposition has already continued for a significantly longer period than it could have continued in the case of a discharged patient who is not a nonresponsibility acquittee. Mental Hygiene Law § 29.15 provides for release of a patient, involuntarily committed under the Mental Hygiene Law, upon conditions, but provides that those conditions may only apply for the remainder of the authorized retention period. Under Mental Hygiene Law § 9.33, that period could not be more than two years.
The court also recognizes that, apart from the imposition of specific conditions, the extension of the order of conditions is an extension of the period during which the defendant is subject to recommitment under the section rather than under the provisions of the Mental Hygiene Law. Subdivision (14) of the section provides that such an application may be made "[a]t any time during the period covered by an order of conditions”. (Cf., Matter of M., Sup Ct, NY County, Mar. 6, 1987, index No. 95492/86.) The provisions for extension of the *691 order of conditions is an extension of up to 10 years of the period during which the defendant is, for these limited purposes, retained in the status of a nonresponsibility acquittee.
Nevertheless, the section contemplates that the order of conditions shall be related to the treatment of the defendant and refers to the relevant Mental Hygiene Law provisions. Subdivision (12) of CPL 330.20 states that, where a release order is sought, the application must include a written service plan as specified in Mental Hygiene Law § 29.15 (g). That provision requires statement of the details of the supervision, medication and after care services (including help in finding employment and housing) which will be provided when an involuntarily committed civil patient is released. Upon release under subdivision (12), an order of conditions must be entered, and it will include the service plan and order compliance therewith.
Subdivision (12) is not directly applicable to this defendant, for in his case there was no order of commitment at the initial hearing, but an order of release on condition. Yet that provision is in pari materia with the applicable reference to release on condition in subdivision (7), as the common definition, with its reference to a service plan, in subdivision (1) (o) shows. Altogether, release may occur in any 1 of 3 contexts: on initial hearing, after a determination that the defendant neither has a dangerous mental disorder nor has a mental illness where in-patient services are essential (the case here), or on application for release after commitment (where either of the necessary findings has been made at the initial or subsequent hearings [subds (7), (8), (9)]) or recommitment (subd [14]). In the former case an order of conditions is discretionary, but in the latter mandatory.
The original order of conditions in this case was entirely concerned with the defendant’s treatment. The proposed resettled and extended order of conditions in this case are also arguably all treatment-related. MHLS admits that both acquittee and nonacquittee commitment and supervision rests on the twin bases of treatment and providing against danger to self or to others, quoting from Jones v United States (463 US 354, 368, supra). This is common ground, as is the Jones admonition (supra, at 369) that the action may not have punitiveness as a purpose. MHLS also tacitly admits what is the case, that the Court of Appeals has not explicitly addressed itself to this tail end of the section. Instead, it argues that the general movement of the law in this area is toward *692 "increasingly tight strictures placed by federal and state courts on the disparate treatment of those found not responsible of [sic] crimes and subsequently adjudicated to be non-dangerous.”
In People ex rel. Henig v Commissioner of Mental Hygiene (43 NY2d 334 [1977]) the court upheld automatic commitment of a nonresponsibility acquittee to the Commissioner of Mental Health while warning that there was a prompt due process right to a hearing on the question of further commitment. In Matter of Torsney (supra) the court approved the release of a nonresponsibility acquittee after a postverdict hearing by the trial court, reversing an Appellate Division reversal. The court explicitly disapproved any suggestion that a " 'dangerous detainee [can] be confined even if not mentally ill or in need of immediate treatment, under CPL 330.20’ ”, as the Appellate Division below had said (supra, at 673). The court said it was acting to avoid due process and equal protection problems under Baxstrom v Herold (383 US 107 [1966]) and Jackson v Indiana (406 US 715 [1972]).
In People v Escobar (61 NY2d 431, supra) the question involved was the standard of proof applicable to proceedings under CPL 330.20. It held that the Legislature in enacting CPL 330.20 had "intended that the courts should apply whatever standard was found to satisfy Federal constitutional requirements.” (Supra, at 439.) Jones v United States (supra) was then held to be dispositive; that case approved a District of Columbia statute which "requires a defendant, who has been acquitted of a crime by reason of insanity, to establish that he has regained his sanity in order to be released *• * * by * * * preponderance of the credible evidence.” (People v Escobar, supra, at 439.) The Court of Appeals then read the intended standard of proof as "by a preponderance of the evidence rather than by the more demanding clear and convincing standard.” (Supra, at 439-440.) It approved this standard both constitutionally and in terms of the purposes of the Legislature in enacting CPL 330.20. In People ex rel. Thorpe v Von Holden (supra) the court approved a remedy by habeas corpus where the Commissioner failed to make timely application for a retention order affecting a nonresponsibility acquit-tee after the expiration of the period of commitment under section 330.20. In doing so, the Court of Appeals continued its measured treatment of nonresponsibility acquittees "somewhat differently” from ordinary civil committees, even though *693 it also relied on Addington v Texas (supra) not a civil nonresponsibility acquittee case.
Addington (supra), as the Court of Appeals points out in Escobar (supra), provides strong contrast with Jones (supra). In an ordinary civil commitment proceeding, the constitutionally minimum standard is "clear and convincing”, but with the criminal acquittee equal protection is not offended even when the burden of proof of nondangerousness is switched to the defendant.
The court believes that it is clear that the Legislature intended to make conditional release for up to 10 years a feature of the over-all plan of dealing with nonresponsibility acquittees. In Matter of Torsney (supra), the court quoted, with apparent approval, the trial court order releasing the defendant subject to conditions applicable for a five-year period. (Matter of Torsney, supra, at 671.) It is noteworthy that the conditions so cited interfere to an unusual degree with the defendant’s freedom, although they are related to the mental illness in question. The defendant, Torsney, previously a police officer, is prohibited for the five-year period from being a peace officer or police officer and from carrying a gun. Provision of a longer period of supervision after custody in the case of nonresponsibility acquittees is not inconsistent with the important constitutional mandate that no one be retained in custody by reasons of mental disease or defect absent a finding of mental illness and dangerousness to self or others. The latter standard is clearly retained by the statute.
Indeed, the provision of subdivision (1) (o) for extension imposes on the government the burden of showing a continuing need for the order of conditions. It is, in this sense, a more benign provision than would have been a provision for a 10-year period of supervision as an original matter. Of course, it is up to the Commissioner and the District Attorney to make the required factual showing.
THE "VOID-FOR-VAGUENESS” DUE PROCESS ARGUMENT
As quoted above, subdivision (1) (o) authorizes an extension of the order of conditions "for good cause shown”. MHLS argues that, in the absence of specific guidelines, there is nothing to caution the defendant as to proscribed conduct and nothing to provide the courts with direction. It cites a number of State and Federal decisions in support of both arguments. (People v Illardo, 48 NY2d 408 [1979], supra; Giaccio v Penn *694 sylvania, 382 US 399 [1966]; Grayned v City of Rockford, 408 US 104 [1972]; Connally v General Constr. Co., 269 US 385 [1926]; United Nuclear Corp. v Cannon, 553 F Supp 1220 [US Dist Ct, RI 1982].) There is, however, no lack of statutory guidance both for the nonresponsibility acquittee subject to the statute or to the court confronted with an application for an extension.
First and foremost, the requirement of "good cause” imposes a burden of justification on the applicant. Moreover, the application is addressed to the court. The court has it within its sound discretion to extend or not extend the order of conditions just as it was originally within its discretion to impose or not to impose conditions at the time of original release under subdivision (7) of the section. That discretion is a judicial discretion acting in accordance with rules and reviewable on appeal; this is not a case where other than the judiciary are delegated a task without a discernible standard as in Giaccio v Pennsylvania (supra [jury]) and Cicero v Olgiati (410 F Supp 1080 [SD NY 1976] [NY State Bd of Parole]).
Moreover, we are not dealing with hopelessly and irreconcilably vague words such as the famous term "gang” in Lanzetta v New Jersey (306 US 451). The court can instead look to the standard set by its context within the entire section, and indeed the entire act of which the section was a part. Much the same standard will apply on application for extension as at the time that discretionary standards were initially imposed. In every case, the order of conditions has an intelligible role to play in the over-all "Comprehensive legislation”. (1981 Report of NY Law Rev Commn, 1981 McKinney’s Session Laws of NY, at 2251.)
The section provides for continuing hearings until discharge. It provides for a court-ordered examination immediately after entry of verdict or plea and an initial hearing. At the initial hearing, the court can commit the nonresponsibility acquittee only if it finds her or him to have a "dangerous mental disorder” or to be, though not dangerous to others, "mentally ill”.
These are both defined terms. (See, CPL 330.20 [1] [c], [d].) Subdivision (1) (d) requires findings, in addition to a finding of mental illness (Mental Hygiene Law § 1.03 [20]), that "inpatient services of a psychiatric center * * * [are] essential to such defendant’s welfare and that his judgment is so impaired that he is unable to understand the need for such care and *695 treatment”. Only if one or the other of these findings is made may a commitment order be made. After commitment, provision is made for hearings at 6 months (commitment order), 18 months (first retention order) and every 24 months thereafter. If the government fails to seek a necessary retention order, habeas corpus is available. (People ex rel. Thorpe v Von Holden, 63 NY2d 546, supra.) In each such hearing, the same standard and the same burden of proof exist: The defendant is entitled to a release unless found, by a preponderance of the evidence, to have a dangerous mental disorder or to be mentally ill.
Two comments can be made about the over-all statutory scheme. The scheme discloses a spectrum of carefully limited types of custody: the commitment and retention orders, the furlough order, the transfer order and the recommitment order. Release after the initial hearing may, and a subsequent release or transfer to nonsecure facilities must, be accompanied by an order of conditions.
Second, the function of the order of conditions is to provide a safeguard to the public that is peculiar to nonresponsibility acquittees. It is important to note, however, that the order of conditions is less restrictive than and provides an alternative safeguard to custody under an order even in the case where the order of conditions permits transfer to a nonsecure or private facility.
The legislative history of the section confirms what appears from a reading of the section. The function of the order of conditions is discussed in the Law Revision Commission Report, discussed above, and the Commission makes it clear that this is the intention and that it was relying on Matter of Torsney (supra) in adopting the conditional release device. (1981 Report of NY Law Rev Commn, op. cit., at 2267, n 41.)
The administration of applications for extensions of an order of conditions under subdivision (1) (o) is not standard-less. Since there are standards applicable to the administration of the statute, the cases cited by MHLS to the effect that a defective statute cannot be saved by a prudent Judge or administrator who happens to give excellent reasons are inapplicable to the present case. (Baggett v Bullit, 377 US 360 [1964].)
That is not to say that action of the application will not on occasion — almost always — present serious factual and legal difficulties reflected in the underlying realities. "For, 'Con *696 demned to the use of words, we can never expect mathematical certainty from our language’ (Grayned v City of Rockford, 408 US 104, 110 [Marshall, J.]). Recognizing reality, the Constitution therefore does not require impossible standards”. (People v Illardo, supra, at 414.)
In the Illardo case a void for vagueness objection to an obscenity statute that permitted an affirmative defense of dissemination to " 'persons or institutions having scientific, educational, governmental or other similar justification for possessing or viewing the same” was rejected. (Supra, at 413.) It was pointed out that the United States Supreme Court, in defining obscenity in the Roth and Miller cases (Roth v United States, 354 US 476; Miller v California, 413 US 15) used the terms " 'literary, artistic, political or scientific value’ ”. (Supra, at 415.)
But that difficulty is inherent in the judicial function, and doubly so when the question is that of commitment or other limitation of the liberties of persons alleged to be suffering from mental disease or defect, whether the proceeding is a civil proceeding growing out of CPL 330.20 or a purely civil proceeding under the Mental Hygiene Law. Mr. Justice Brennan dissenting in Jones v United States (supra, at 377-378) says: "As we recognized in Addington, '[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations.’ 441 U.S., at 430. The question is not whether 'government may not act in the face of this uncertainty,’ ante, at 365, n. 13; everyone would agree that it can.”
The differing conclusions reached by the majority of 5 and the minority of 4 in the Jones case (supra) may and should admonish the court as to the difficulty involved in all such cases, but uncertainty of this sort is not what is proscribed by the void for vagueness doctrine.
The present situation is unlike that discussed in Matter of Catherine L. (NYLJ, Nov. 27, 1987, at 31, col 1 [Rockland County, Miller, J.]). There, the Mental Hygiene Law expressly makes involuntary commitment standards inapplicable to retention and treatment applications. Moreover, there Justice Miller was objecting to the assumption that such applications "are dealt with in our judicial system as perfunctory, pro forma matters. They are not afforded even equal status with that of motor vehicle cases, real estate foreclosure proceedings or ordinary commercial litigation.” (Supra, at 31, col 4.)
*697 This court finds support in a similar conclusion on this very issue reached by Mr. Justice Turret and cited by the Attorney-General. (People v Beilin, Sup Ct, Bronx County, Mar. 12, 1987, index No. 23/81.) The court is also grateful that the Attorney-General has drawn attention to the helpful language and reasoning by Mr. Justice Shorter in Matter of M. (Sup Ct, NY County, Mar. 6, 1987, index No. 95492/86, supra).
This court thus rejects the constitutional objections presented by MHLS in limine. This court wishes, however, to state that the objections raised were serious and important and that it appreciates the professional skill with which MHLS has presented them.
SUBSTANTIVE DISPOSITION OF THE MOTION TO RESETTLE AND EXTEND
This court has established that it validly has power to act on the Commissioner’s motion and concludes that this motion should be based on the same materials as are required in the case of an application for an order of release and order of conditions under subdivision (12). Accordingly, the matter shall be placed on the calendar for a hearing before any Justice of this court at the earliest possible date.

 Since this motion primarily involves the validity of CPL 330.20 and since that section’s numerous subdivisions otherwise make for clumsy reference, the "section” or "section 330.20” shall mean CPL 330.20 unless the context requires otherwise, and references to "subdivision” shall mean a subdivision of the section unless the context requires otherwise.